IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ROBIN KOSTER | ) | |
| | ) | Case No. |
| Plaintiffs, | ) | |
| | ) | Judge |
| v. | ) | |
| | ) | |
| TRANS UNION, LLC | ) | **Jury Demand Endorsed Hereon** |
| | ) | |
| Defendants. | ) | |

# COMPLAINT

1.  This is an action for actual and statutory damages brought by Plaintiff, Robin Koster, against Defendant, Trans Union, LLC, for violations of the the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, as more fully described below.

## PARTIES

2.  Plaintiff, Robin Koster, is an adult individual who is and was, at all times relevant hereto, a resident of St. Peters, St. Charles County, Missouri. Plaintiff is a "consumer" as defined by Section 1681*a*(c) of the FCRA.

3.  Defendant, Trans Union LLC ("Trans Union"), is a Delaware corporation doing business throughout the country and in the State of Missouri.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. §§ 1681p and 28 U.S.C. § 1337.  Venue in this judicial district is proper because Mrs. Koster resides in this judicial district and many of the facts relevant to this Complaint occurred in this judicial district.

**INTRODUCTION**

5. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual citizens. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individuals to flow immediately to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients, and all of society should benefit from the resulting convenience and efficiency.

6. Unfortunately, however, this information has also become readily available for and subject to mishandling and misuse. Individuals can sustain substantial damage, both emotionally and economically, whenever inaccurate or fraudulent information is disseminated about them.

7. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

8. These CRAs sell to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers and similar interested parties) information commonly called "consumer reports," concerning individuals who may be applying for retail credit, to lease an apartment, to obtain a mortgage or employment or the like.

9. Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 et seq. ("FCRA"), federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers. The FCRA sets

forth this and many other requirements for not only CRAs' operations, but also for the furnishers of information as well.

## BACKGROUND INFORMATION AND FACTUAL ALLEGATIONS

10. Plaintiff's full name is Robin Jo Koster, formerly Robin Jo Soroski, born Robin Jo Maglinger. She is not, nor has she ever been known by the name, Robin Hatcher or Robin Hardin. Mrs. Koster does not know anyone with the names Robin Hatcher or Robin Hardin.

11. Mrs. Koster resides in St. Peters, Missouri. She has been a resident of Missouri for more than twenty-five (25) years.

12. Mrs. Koster is a Senior Administrative Assistant at RGA Reinsurance Company.

13. Mrs. Koster takes great pride in her good name and credit rating. She has no outstanding debts that are delinquent. She pays her bills on time each month and believes her credit history should reflect an excellent rating.

### Plaintiff Has Suffered Chronic Credit Reporting Inaccuracies

14. In 2002, after separating from her then-husband, Mrs. Koster sought to obtain credit in her own name. While Mrs. Koster believed and understood that she had perfect credit at that time, she was unable to obtain a credit card.

15. Specifically, in June 2002, after applying for a Discover Platinum card, Mrs. Koster received a letter from Discover stating that they were unable to approve her credit application because of various collection accounts and/or other delinquent credit obligations appearing in her Trans Union credit report.

16. Surprised by this response, Mrs. Koster immediately contacted Trans Union to request a copy of her credit report.

17. Upon receiving her Trans Union credit report and credit score in June 2002, Mrs. Koster's surprise turned to shock, confusion and dismay. The credit report showed fifteen (15) adverse credit items, none of which Mrs. Koster had ever heard of, and none of which belonged to her. *See* Trans Union Credit Report dated June 20, 2002 (a redacted copy of which is attached hereto as Exhibit 1). These negative credit entries resulted in Mrs. Koster's credit score being a low 589.

18. Plaintiff immediately contacted Trans Union by telephone to dispute the incorrect information. She was told by a man who identified himself as "Charles Willis" that Trans Union would investigate her disputes and get back to her.

19. Seeing so many items of delinquent credit appearing in her report, Mrs. Koster inquired whether or not she should contact the police. She was told by Mr. Willis that her situation might not involve a theft of identity but rather a "crossing" of information, so she should not file a police report until they were certain some sort of fraud had occurred.

20. Not being familiar with the credit reporting system, Plaintiff relied upon and trusted that Trans Union, as the expert of its own business, would do whatever was necessary to make sure her mistake-filled credit report was fixed.

21. Around the same time, Mrs. Koster requested a "3-in-1" credit report from an entity called True Credit so as to see what was being reported about her by all three national credit bureaus. *See* True Credit 3-in-1 Credit Report dated June 28, 2002 (a redacted excerpt of which is attached hereto as Exhibit 2). This report showed Trans Union reporting her under the name "ROBIN A HARDIN" with an "also known as" name of "Robin J. Hatcher" even though the Trans Union report she received just days prior did not include either of these names.

22. Believing that perhaps she was truly a victim of identity theft, Mrs. Koster filed a police report. She also contacted the Social Security Administration to request confirmation of her Social Security number and earnings records.

23. Mrs. Koster was distraught believing that someone had stolen her identity and was now obliterating her good name. She continued to hope and trust that Trans Union would do whatever was necessary to correct matters from a credit reporting standpoint so as to stop further harm to her from the false information Trans Union was reporting.

24. In July 2002, Mrs. Koster received the "investigation results" and another credit report from Trans Union in response to her dispute the previous month. Mrs. Koster was pleased to see that several of the delinquent accounts had been deleted. However, one still remained and a new adverse account appeared. The name on the report also appeared as "HARDIN, ROBIN A." which was wrong. There was no mention of the name Robin Hatcher.

25. Upon receipt of this information, Mrs. Koster contacted Trans Union by telephone once again to dispute the false information, most notably the incorrect name on her credit report. After speaking to a woman who identified herself as "Lilly," Mrs. Koster followed up in writing which she forwarded to Trans Union via facsimile.

26. Within a matter days, Mrs. Koster received a letter from Trans Union representing that the name on a consumer's credit report is controlled by the consumer's creditors:

> Creditors add your name into their records exactly as you have provided it to them. They then report your name to Trans Union as it appears in their records. If you would like your name to appear differently on your credit report, contact your creditors directly.

*See* Letter from Trans Union dated August 14, 2002 (a copy of which is attached hereto as Exhibit 3). Mrs. Koster was at a loss for how *she* could make sure that her Trans Union credit report contained only *her* correct name when Trans Union was in exclusive control of what

information it allowed into Mrs. Koster's Trans Union credit report in the first place, and Trans Union already knew that any creditors that may be reporting that false information were doing so perhaps as a result of fraud so the information should not be included in Mrs. Koster's credit report at all.

27.     Shortly thereafter, Mrs. Koster was devastated to receive a collection notice addressed to "Robin Hatcher" but at Mrs. Koster's correct address.  Being subjected to the embarrassment of a denial of credit was bad enough, but now contemplating debt collectors hounding her for debts that do not belong to her was extremely distressful to Mrs. Koster.

28.     Mrs. Koster was also confused and discouraged that while her recent Trans Union credit report showed the name "Robin A. Hardin," she was getting collection notices at her home address under the name "Robin Hatcher."  Very concerned and scared for what she might find, Mrs. Koster requested another "3-in-1" credit report.

29.     In reviewing her latest True Credit "3-in-1" report, Mrs. Koster discovered that Trans Union had restored her correct name to the file, but the name "Robin Hatcher" appeared again as an "also known as" name.  Trans Union also continued to wrongly show two derogatory accounts as belonging to Mrs. Koster.  *See* True Credit 3-in-1 Credit Report dated November 27, 2002 (a redacted excerpt of which is attached hereto as Exhibit 4).

30.     Feeling helpless as to how to proceed, Mrs. Koster sought the assistance of an attorney.

31.     In December 2002, Mrs. Koster, by and through this attorney, contacted all three national credit bureaus, specifically including Trans Union, and carefully set forth the facts as known to Mrs. Koster and disputing the continued appearance in her credit report of information

under someone else's name.  *See* Letter from Robert M. Kirtley dated December 16, 2002 (a copy of which is attached hereto as Exhibit 5).

32. Over the next several months, Mrs. Koster, with the help of her attorney, fought to get the false items of information removed from Mrs. Koster's credit report.  Believing that was accomplished, Mrs. Koster wrote to Discover Platinum Card in or around August 2003, asking them to reconsider giving her a credit card.

33. To Mrs. Koster's shock and dismay, her Discover Platinum Card credit application was again denied.  Trans Union was again identified as the source of the highly derogatory credit information that was used as the basis for that denial.

34. Mrs. Koster was at a complete loss for what to do.  She had provided all possible information to Trans Union, and yet they simply could not or would not remove the false information from her credit report.

35. Dealing with other life struggles, including a personal battle with cancer as well as the loss of her mother, Mrs. Koster would periodically over the years request her credit report to see what it looked like, sheepishly hoping that at some point the underlying problems were miraculously solved.  They never were.

### Trans Union's Knows of a Long-Standing Mixed File Problem

36. A "mixed file" is a credit report in which some or all of the information contained therein pertains to a person (or persons) other than the person who is the subject of the report.

37. Trans Union knows and understands what a mixed file is.

38. On October 26, 1992, Trans Union entered into a Consent Order with numerous States' Attorneys General to settle charges stemming from Trans Union's failure to insure that the credit reports they compile were of maximum possible accuracy.  *See State of Alabama, et al.*

7

*v. Trans Union Corporation*. unreported, Civil Action No 92-C-7101 (Judge James B. Zagel), N.D. Ill., October 26, 1992.

39.     The State of Missouri was one of the States whose Attorney General instituted this action on behalf of its citizens against Trans Union.

40.     The goal of the Consent Order "was to avoid the occurrence of mixed files, which are files that erroneously contain information from more than one consumer." *Bentley v. Providian Financial Corp.*, unreported, 2003 WL 22234700, S.D.N.Y., Apr 21, 2003.

41.     Since 1992, Trans Union has been sued by individual consumers in state and/or federal courts dozens of times related to mixed file problems.

42.     In 2002, a jury awarded $5,300,000.00 in actual and punitive damages to an Oregon woman in a mixed file case against Trans Union. The punitive award was later reduced to $1,000,000.00. *See Judith C. Thomas v. Trans Union LLC*, D. Ore. (Magistrate Judge John Jelderks), January 29, 2003.

## FACTUAL ALLEGATIONS

43.     In May 2011, Mrs. Koster requested her credit report once again. This credit report included multiple names – some variations not previously seen on her credit report – as well as new collection accounts not previously seen by Mrs. Koster. *See* Trans Union Credit Report dated May 5, 2011 (a redacted copy of which is attached hereto as Exhibit 6).

44.     Mrs. Koster contacted Trans Union in writing to dispute the false information appearing in her latest report. She reminded Trans Union of the fact that she had experienced problems with her credit report since 2002, providing them details of the information she had learned over the years:

8

> There is a person in Owensboro, Kentucky who has a similar name as mine, as well as [a] similar Social Security number and date of birth. My credit report, over the years, has reflected this person's last name(s), address(es) and credit history.

*See* Letter from Robin Koster dated July 20, 2011 (a redacted copy of which is attached hereto as Exhibit 7).

45. In response, Trans Union played dumb:

> After reviewing your correspondence, we are unable to process your request because we were unable to determine the nature of your request[.]

*See* Letter from Trans Union dated August 1, 2011 (a copy of which is attached hereto as Exhibit 8).

46. Mrs. Koster was extremely aggravated by Trans Union's response. She believed and understood that it was Trans Union's responsibility to make sure that her credit report was accurate all along, and yet they scoffed at that responsibility for years. So to play games with her at this point, pretending as though they could not possibly know what could be wrong with her credit report, felt like a slap in the face.

47. Trying in good faith to make one last ditch effort to give Trans Union the information it claimed it lacked, Mrs. Koster contacted Trans Union again to dispute the false information in her credit report. She included a copy of the detailed dispute letter written to Trans Union in December 2002, which contained all necessary "specifics" Trans Union claimed not to have including the name, Social Security number and date of birth of the other individual. *See* Letter from Robin Koster dated November 9, 2011 (a copy of which is attached hereto as Exhibit 9).

48. In response, Trans Union simply sent Mrs. Koster another copy of her credit report – a report containing all the same false information as before. *See* Trans Union Credit

Report dated November 18, 2011 (a redacted copy of which is attached hereto as Exhibit 10). Inexplicably, Trans Union ignored Mrs. Koster's dispute altogether.

49. There is simply no excuse for Defendants' failure to correct their records once and for all so as to make Mrs. Koster's credit report reflect the good name and credit rating she has worked so hard to earn.

50. Nevertheless, Trans Union has proven that they simply refuse to correct Mrs. Koster's credit report absent litigation.

## COUNT ONE
## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

51. Plaintiff hereby incorporates by reference all well-pleaded allegations contained in the preceding paragraphs as if fully rewritten herein.

52. A "consumer reporting agency" is defined in 15 U.S.C. § 1681 *a*(f) as follows:

any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

53. Trans Union is a consumer reporting agency as defined by Section 1681*a*(f) of the FCRA.

54. Section 1681*n* of the FCRA imposes civil liability on any CRA "who willfully fails to comply with any requirement" of the Act. See 15 U.S.C. § 1681*n* (a).

55. Section 1681*o* of the FCRA provides for civil liability against any CRA that is negligent in failing to comply with any requirement imposed under the Act.

### Trans Union's Failure To Adopt And/Or Follow Reasonable Procedures

56. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of

the information concerning the individual about whom the report relates." *See* 15 U.S.C. § 1681*e*(b).

57. On numerous occasions in the past two (2) years, Trans Union has prepared a consumer report concerning Mrs. Koster, and disseminated such reports to one or more third party(s).

58. Trans Union willfully and/or negligently failed to establish and/or follow reasonable procedures to assure maximum possible accuracy of the consumer reports it prepared and/or published concerning Mrs. Koster in violation of Section 1681*e*(b).

59. As a direct and proximate result of Trans Union's willful and/or negligent refusal to adopt and/or follow reasonable procedures as mandated by the FCRA, Mrs. Koster has suffered loss and damage including, but not limited to, financial loss, expenditure of time and resources, mental anguish, humiliation, embarrassment and emotional distress, entitling her to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681*o*.

60. Trans Union's continued refusal to adopt and/or follow reasonable procedures as mandated by the FCRA reveals a conscious disregard of the rights of Plaintiff. The injuries suffered by Mrs. Koster are attended by circumstances of fraud, malice, and willful and wanton misconduct entitling Mrs. Koster to statutory damages and calling for the assessment of punitive damages, attorneys' fees and costs pursuant 15 U.S.C. § 1681*n*(a)(2).

### **Trans Union's Failure to Conduct Reasonable Reinvestigations**

61. The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a

consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681*i*(a)(1). The Act imposes a 30-day time limitation for the completing of such an investigation. Id.

62. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is, in fact, inaccurate, or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681*i*(a)(5)(A).

63. If any information is deleted from a consumer's file pursuant to this rule, "the information may not be reinserted in the file by the consumer reporting agency unless the person who furnished the information certifies that the information is complete and accurate." *See* 15 U.S.C. § 1681*i*(a)(5)(B).

64. In July 2011, Mrs. Koster wrote to Trans Union and requested that they delete any and all information in her credit file that belonged to another consumer(s) named Robin A. Hardin or Robin Hatcher.

65. By the time Trans Union received this dispute, Trans Union had in its possession extensive information provided by Mrs. Koster personally, as well as by her attorney, regarding the fact that someone else's information was appearing in Mrs. Koster's credit report.

66. By July 2011, Trans Union had been on notice for twenty (20) years that mixed files were a common problem within the credit reporting industry, causing consumers considerable harm and angst.

67. Trans Union unreasonably refused to investigate Mrs. Koster's July 2011, dispute – a dispute that outlined a mixture of information with another consumer – even though it possessed sufficient knowledge at that time of the problems associated with Mrs. Koster's credit report.

68. By failing to conduct any investigation into Plaintiff's dispute, Trans Union willfully and/or negligently violated Section 1681*i*(a)(1).

69. On or around November 9, 2011, Mrs. Koster wrote to Trans Union to dispute again the false information appearing in her credit report.

70. Trans Union appears to have conducted no investigation of Plaintiff's dispute, and the false information remained in Mrs. Koster's credit file despite her dispute.  As such, Trans Union willfully and/or negligently failed to conduct a reasonable investigation in violation of Section 1681i(a)(1).

71. As a direct and proximate result of Trans Union's repeated disregard for Plaintiff's disputes and the importance of her good credit rating, Mrs. Koster has suffered a significant loss of trust in the credit reporting system and its accountability to the average consumer such as herself.

72. As a direct and proximate result of Trans Union's willful and/or negligent refusal to conduct a reasonable investigation as mandated by the FCRA and as outlined above, Mrs. Koster has suffered loss and damage including, but not limited to, financial loss, expenditure of time and resources, mental anguish, humiliation, embarrassment and emotional distress, entitling her to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681*o*.

73. Trans Union's pattern of refusal to correct patently false information as mandated by the FCRA reveals a conscious disregard of the rights of Plaintiff.  The injuries suffered by Mrs. Koster are attended by circumstances of fraud, malice, and willful and wanton misconduct, calling for an assessment of punitive damages, statutory damages, attorneys' fees and costs pursuant 15 U.S.C. § 1681*n*(a)(2).

## **Permissible Purpose Violations**

74. The FCRA establishes very specific and stringent rules regarding the circumstances under which a consumer reporting agency may provide credit information regarding a consumer:

> **In General.** – * * * [A] consumer reporting agency may furnish a consumer report under the following circumstances and no other:
>
> *      *      *
>
> **(3)** To a person which it has reason to believe –
>
> (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer;
>
> *      *      *
>
> (F) otherwise has a legitimate business need for the information * * *
>
> (ii) to review an account to determine whether the consumer continues to meet the terms of the account.

*See* 15 U.S.C. § 1681*b*(a)(3).

75. On no less than four (4) occasions in the past two (2) years, Trans Union has released Plaintiff's credit report in response to an inquiry seeking the information of another individual.

76. Trans Union was not legally permitted to provide Plaintiff's credit report to such entities since Mrs. Koster was not the individual who applied for the subject credit, insurance or employment which was the subject of the underlying inquiry.

77. Trans Union knew or could have known by looking at its own records that Plaintiff's credit information was mixed with that of another consumer.

78. Trans Union did not have a permissible purpose to release Plaintiff's credit file in response to an inquiry on any other individual besides Plaintiff.

79. As a direct and proximate result of Trans Union's conduct as outlined above, Mrs. Koster has suffered injury including, but not limited to, mental anguish and emotional distress from the ongoing invasion of her privacy, entitling Mrs. Koster to an award of actual damages in an amount to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681*o*.

80. Trans Union's conduct reveals a conscious disregard of the rights of Plaintiff. The injuries suffered by Mrs. Koster are attended by circumstances of fraud, malice, and willful and wanton misconduct entitling Mrs. Koster to punitive damages pursuant 15 U.S.C. § 1681*n*(a)(2).

WHEREFORE, Plaintiff, Robin Koster, prays for judgment in her favor and against Defendant, Trans Union LLC, and for the following relief:

A. An award of actual damages in such amounts as determined by the jury;

B. Statutory damages pursuant to 15 U.S.C. § 1681n;

C. An assessment of punitive damages against Defendant;

D. Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 15 U.S.C. § 1681o; and

E. Such other and further relief as may be just and proper.

Respectfully submitted,

/s/ *Robert T. Healey*
Robert T. Healey, Esq.
HEALEY LAW, LLC
640 Cepi, Suite A
Chesterfield, MO 63005
Telephone:  (636) 536-5175
Facsimile:  (636) 590-2882
Email:  rhealey1960@gmail.com

Sylvia A. Goldsmith, Esq.
LAW OFFICE OF SYLVIA A. GOLDSMITH
Gemini Towers
1991 Crocker Road, Suite 600
Westlake, OH  44145
Telephone:  (440) 934-3025
Facsimile:  (440) 934-3026
Email:  sgoldsmith@sgoldsmithlawoffice.com

Attorneys for Plaintiff

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable in this lawsuit.

Dated this 13th day of January 2011.

/s/ *Robert T. Healey*
Robert T. Healey, Esq.
HEALEY LAW, LLC

Attorney for Plaintiff